IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

KRISTIN FULLER,           )
                        )
        Plaintiff,        )
                        )
        v.              )       CASE NO. 3:13-CV-520-WKW
                        )            [WO]
SL ALABAMA, LLC,      )
                        )
        Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kristin Fuller alleges that Defendant SL Alabama, LLC, also known as Samlip Alabama, should be held liable for condoning a sexually and racially hostile work environment and for discriminating and retaliating against her in violation of federal law.  Before the court is Defendant's motion for summary judgment (Doc. # 27), which has been fully briefed (Docs. # 28, 29, 32, 33, 35).  Upon consideration of the parties' arguments, the record evidence, and the relevant law, the court concludes that Defendant's motion is due to be granted in part and denied in part.

## I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at

324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  BACKGROUND[1] [2]

#### A.    <u>Setting the Stage</u>

Defendant manufactures headlights and light components for Hyundai Motor Manufacturing Alabama, among other customers.  Defendant's Alexander City plant is open as many as seven days a week, and employees work one of two twelve-hour shifts.  Defendant operates about nineteen production assembly lines with five to seven employees working on each line.  At the end of each line is a quality inspector who must determine if Defendant's products meet Defendant's customers' specifications.  If a headlight is not compliant with all specifications, then the quality inspector segregates it from acceptable products and tags it with a written note identifying the defect.  Ms. Fuller, who worked as a quality inspector, describes this as "throwing out" the parts.

---

[1] The parties present competing versions of the facts in their briefs.  Defendant asserts in its reply brief that Ms. Fuller "is deemed to have admitted all" of Defendant's proposed facts in the summary judgment brief because she did not respond directly to those facts.  (Doc. # 35, at 3.)  The court disagrees and concludes that Ms. Fuller's account of the facts in her brief is responsive and is mostly, if not completely, supported by materials in the record.  *See* Fed. R. Civ. P. 56(c)(1).  It is customary for parties responding to a motion for summary judgment to set out their own version of the facts without stipulating to or rebutting the moving party's version of the facts sentence by sentence.  The court has considered, however, Defendant's objections that certain facts in Ms. Fuller's account of events are unsupported by admissible evidence.

[2] Unless indicated otherwise, page number references within this opinion are to the pages numbers created by CM/ECF.

For several years, roughly a quarter of Defendant's workforce has been hired on a temporary basis by outside staffing agencies.  Allegiance Staffing, one of those "temp" agencies, placed Ms. Fuller, who is white, as a temporary employee at Defendant's plant as a quality inspector working from 5:00 a.m. to 5:30 p.m. Gary Taunton was the onsite supervisor for Allegiance at that time, and Ms. Fuller answered to him.  However, she was also supervised by Defendant's supervisory employees, including Marion Wilson, Defendant's Quality Supervisor.  Ms. Wilson and Candice Britton, one of Defendant's Quality Team Leaders, roved the assembly floor, overseeing the work of each line and of the quality inspectors like Ms. Fuller.  Both Ms. Wilson and Ms. Britton are black.  Ms. Fuller was also accountable to Defendant's HR Manager, Debbie Meeks, who enforces Defendant's attendance policy, but there is no evidence that Ms. Fuller ever dealt directly with Ms. Meeks.  Allegiance maintained its employees' time records, but Defendant's attendance policy, described *infra*, governed temp employees like Ms. Fuller.

## B.   Alleged Sex- and Race-Based Harassment and Discrimination

Ms. Fuller claims that she endured sexually and racially abusive treatment while working in Defendant's plant.  While she admits that she is not certain about the precise dates of the events described below, she was only employed for about

three weeks on the production lime where she alleges the actual harassment occurred.

Ms. Fuller's primary complaints relate to her interactions with Xavious O'Neal, a black male coworker who was permanently employed by Defendant. Mr. O'Neal allegedly harassed Plaintiff from the first day she reported to work on July 20, 2012.[3] Mr. O'Neal worked in close proximity to Ms. Fuller at the end of an assembly line. According to Ms. Fuller, machinery that is approximately six- or seven-feet tall separated her and Mr. O'Neal from other employees on the line, and other employees usually worked with their backs to the end of the line.

Mr. O'Neal allegedly was interested in having sexual intercourse with and performing other sexual acts upon Ms. Fuller and made his intentions known. Ms. Fuller claims that Mr. O'Neal first asked her if she was married to a black man or a white man, inquired if she had ever been the sexual partner of a black man, and told her she was a "fine ass white girl." Ms. Fuller rebuffed Mr. O'Neal and told him that she was married, but Mr. O'Neal suggested that what her husband did not know would not hurt him. He continued to make sexual advances, allegedly by touching Ms. Fuller's breasts and buttocks repeatedly, asking her questions about how she groomed her vagina, asking to photograph and to lick her vagina, and proposing that they have sex. Ms. Fuller says that Mr. O'Neal engaged in this

---

[3] However, Defendant has presented time and attendance records showing that Mr. O'Neal was not at work for the first two days of Ms. Fuller's tenure. (Doc. # 29-1, at 37.)

abusive speech and behavior in the open sight and hearing of other workers on the assembly line, and that he persisted almost every day that he was at work for about two weeks.  However, there are no other witnesses who have corroborated her narrative.

Ms. Fuller says that she was subjected to racial harassment as well, which apparently came from Mr. O'Neal and other black female employees on the line. They criticized and verbally confronted Ms. Fuller more than once because they believed she was arbitrarily rejecting and tagging their products as defective. Some of the employees took the parts that Ms. Fuller had tagged as defective, untagged them, and placed them on a cart to be shipped out of Defendant's facility to customers.

When Ms. Fuller first reported to Ms. Britton that her coworkers were untagging defective parts, Ms. Britton told her that she was being a "drama queen." Ms. Britton told the line employees not to talk to Ms. Fuller, and told Ms. Fuller not to talk to the line employees.  Ms. Fuller claims that she also told Ms. Britton that Mr. O'Neal was touching her buttocks, but that Ms. Britton did not address her complaint.  Ms. Britton denies that Ms. Fuller ever complained about Mr. O'Neal's alleged sexual harassment.

A couple of days after seeking out Ms. Britton, Ms. Fuller claims that she told Mr. Taunton, her onsite Allegiance supervisor, that Mr. O'Neal was groping

her breasts and buttocks, asking her when she would "put that pussy on a real nigger," and calling her a "white bitch."  (Fuller Dep. at 93–96.)  According to Ms. Fuller, Mr. Taunton told her that she should stay away from Mr. O'Neal and to tell him to stop making advances.  There is no evidence in the record that Mr. Taunton conveyed Ms. Fuller's report to Defendant's management or human resources ("HR") department.

Ms. Fuller claims that a few days after talking to Mr. Taunton, she told Ms. Wilson in detail about Mr. O'Neal's sexual comments and offensive touching.  Ms. Fuller says that Ms. Wilson "kind of snapped," suggested that Ms. Fuller was creating trouble, and told Ms. Fuller to stop tattling on others.  (Fuller Dep. at 107–09.)  Ms. Wilson allegedly dismissed the complaints and sent Ms. Fuller back to work.   Ms. Wilson denies that Ms. Fuller ever complained to her about Mr. O'Neal.

Not long thereafter, Ms. Fuller says she became fed up with Mr. O'Neal's offensive remarks, so she yelled at him to stop speaking to her like she was a dog.  Then, the "whole line got involved," creating a scene that required Ms. Wilson to intervene.   (Fuller Dep. at 104.)   Other black females on the line accused Ms. Fuller of lying about Mr. O'Neal's offensive behavior.   They and Mr. O'Neal confronted Ms. Fuller, calling her "stupid ass white girl" and "white bitch." (Fuller Dep. at 57.)  Mr. O'Neal complained that Ms. Fuller did not know what she

was doing and needed to be fired.  One of the women announced that Ms. Fuller's rejection of the line's good parts was one reason that she "d[id not] like white folks." (Fuller Dep. at 119.)  Ms. Fuller claims that Ms. Wilson did not correct the employees for their language or racial animus and simply directed everyone to get back to work.

Ms. Wilson says she was called upon to address the incident, but denies that anyone cursed at Ms. Fuller or said anything that was racially offensive.  Ms. Wilson says that the argument arose from Ms. Fuller's rejection of the line's parts as defective – not from any complaints about Mr. O'Neal's behavior.

Ms. Fuller claims that when she complained to Ms. Wilson on the day of the incident involving the whole line, Ms. Wilson accused her of being a tattletale, suggested that Defendant's management would believe its permanent employees over her, and threatened to "get rid of" Ms. Fuller "if [she] kept causing all the problems amongst employees." (Fuller Dep.  at 116–117.)

## C.    <u>Harassment Policies for Defendant and Allegiance</u>

Defendant maintains an Associate Handbook which prohibits workplace harassment on the basis of sex or race and requires employees to bring issues to the company's attention, whether the employees are themselves the victims of harassment or witnesses to it. (*See* Doc. # 29-1, Attachment 12.)  Per the Associate

Handbook, associates should bring matters to the attention of their supervisors, or alternatively, to Defendant's HR manager or Assistant HR Manager.

When Ms. Fuller began her assignment with Defendant through Allegiance, she did not receive a copy of the Associate Handbook.  Ms. Meeks testified that Defendant does not provide temp employees with its Associate Handbook because temp employees "are governed by their employer," *i.e.*, the temp agency.  (Meeks Dep. at 28–29.)  Ms. Fuller she says that she understood from her orientation that if she or others experienced harassment, they were to report it to "our supervisors." (Fuller Dep. at 34–35.)  It is not clear from her testimony whether her orientation was led by Allegiance or by Defendant or whether "supervisors" included Defendant's supervisors in addition to Mr. Taunton.  Presumably, Ms. Fuller believed she should report could report misconduct to Defendant's supervisors, because she says that she complained about racial and sexual harassment to both Ms. Britton and Ms. Wilson.

Allegiance also maintained a harassment policy.  On July 17, 2012, Ms. Fuller signed a notice of receipt of the policy which was entitled "Drug Free, Alcohol Free, Harassment Free Workplace Policy Notification."   (Doc. # 29-4 at 53–54.)  The policy statement explains that Allegiance has "partnered" with its clients like Defendant "to provide and enforce the same policy."  (Doc. # 29-4, at 53.)   It defines unacceptable workplace behavior and includes a provision

defining a victim's responsibility to "tell[ ] the offender to stop the unwelcome conduct" and to "report the conduct to the supervisor *and* to any of" several Allegiance offices "in order that corrective action may be taken." (Doc. # 29-4 at 54.) "Supervisor" is not otherwise defined as to Allegiance or Defendant's supervisors. Ms. Fuller claims that she reported harassment to Mr. Taunton, her Allegiance supervisor, but admits that she did not report the misconduct to an Allegiance office until after her assignment was terminated. (*See* Fuller Dep. at 143–45.) There is no record evidence of Mr. Taunton's testimony about whether Ms. Fuller complained to him or about what she had experienced.

### D.   Ms. Fuller's Reassignment

On August 15, 2012, which was within a week of when Ms. Fuller says she had most recently complained to Ms. Britton and Ms. Wilson about being harassed, Mr. Taunton called Ms. Fuller to tell her not to report to the plant for work. She claims that Mr. Taunton told her that Defendant chose to end the assignment and that she was not given a reason.

Defendant, through HR Manager Debbie Meeks, says that Ms. Fuller was reassigned for absenteeism. The attendance policy for temps as opposed to permanent employees is strict: They are allowed to incur only three points for absences of any kind. If a temp calls-in prior to her absence, she incurs one point. If she neglects to call in prior to her absence, she incurs two-and-a-half points. If

10

she is tardy or leaves work early, missing over four hours of her shift, she incurs one point, and if tardiness or an early departure results in missing less than four hours of work, earns a half point.  If the employee exceeds two points in her first month of assignment, the temp is reassigned – *i.e.*, released from employment at Defendant's plant.   Ms. Fuller claims that she was advised that Defendant's attendance policy was applicable to her, but that she was not provided with an Associate's Handbook.

Defendant explains that on August 13, 2012, Ms. Meeks was informed – she cannot remember by whom – that Ms. Fuller was absent from work.  Ms. Meeks checked her records and determined that Ms. Fuller accumulated two-and-a-half points – one half point for leaving early on August 7, 2012, one full point on August 10, 2012 for a call-in absence, and another point on that day, August 13, for leaving over four hours early.  Because the points had accrued in less than one month's time, Ms. Meeks decided to reassign Ms. Fuller effective August 15, 2012.  Ms. Meeks says that she has made the same decision to terminate other temp employees prior to three points for frequent absenteeism, regardless of their race, gender, or whether they had complained.  (*See* Meeks Dec. at ¶ 8.d. (citing

Doc. #29-1, at 16).)  Per Defendant's policy, Ms. Fuller believed that she could accrue three points before her assignment would be terminated.[4]

Ms. Fuller also contests Defendant's representations that Ms. Meeks decided to reassign Ms. Fuller and asserts that Ms. Wilson was the decision-maker.  Ms. Wilson believed that Ms. Fuller was absent without calling in for several days starting August 15, 2012.  (*See* Wilson Dec. at ¶ 6.b.)  Ms. Wilson did not know that Ms. Meeks had told Ms. Fuller on August 15, 2012, through Mr. Taunton, not to come back to work.  Ms. Wilson reported the absences to Mr. Taunton, who, according to Ms. Wilson, did not convey that Ms. Meeks had reassigned Ms. Fuller.  Ms. Wilson says that she tried to show Ms. Fuller leniency, but by the following Monday, presumably August 20, 2012, she told Mr. Taunton that she could no longer hold the job for Ms. Fuller, and that she would no longer have a position at Defendant's plant.  (Wilson Dep. at 19–20.)  Ms. Wilson says she was not motivated by Ms. Fuller's race or because Ms. Fuller had complained in the past.

---

[4] Ms. Fuller asserts that she was terminated "before she received her second point." (Doc. # 32, at 6, ¶ 16.)  It is not clear whether this is a typographical or mathematical error on her part, but she does not dispute that she was absent on the days and times that Ms. Meeks asserts she was absent.  Elsewhere in her brief, she asserts that the attendance records "do not show that [she] had more than 2.5 points."  (Doc. # 32, at 48.)  The court deduces, therefore, that there is no dispute that by the time Ms. Meeks made her decision to terminate Ms. Fuller's assignment, Ms. Fuller had acquired two-and-a half points.

**E.**   **Ms. Fuller's Assignment with EHD**

Mr. Taunton found another placement for Ms. Fuller with a different employer, EHD Quality, which was a third-party inspection contractor hired by Defendant's customers to work at Defendant's plant.  EHD, like Defendant, used Allegiance temp employees.  EHD placed Ms. Fuller in a "lead" position, and she was responsible for inspecting parts in Defendant's warehouse, which is a separate area from where Ms. Fuller worked previously.  When Ms. Wilson and Ms. Britton saw Ms. Fuller back at work, Ms. Fuller says they cursed and yelled at her and accused her of throwing out good parts out of spite for being reassigned by Defendant.  Ms. Fuller says she continued to have conflict with Ms. Wilson and Ms. Britton during her second assignment, and she says that the women complained to Ms. Fuller's EHD supervisor, Todd.  Ms. Fuller says that Todd asked her to step down from her lead position, allegedly because EHD was fearful that the interpersonal conflict was jeopardizing its contract.  (Fuller Dep. at 52–53.) Ms. Wilson denies any involvement in recommending that Ms. Fuller be demoted or terminated as an employee with EHD.  Ms. Britton likewise denies asking anyone with EHD to end Ms. Fuller's assignment, but both she and Ms. Wilson acknowledge reporting to Todd their belief that Ms. Fuller routinely rejected good products in the course of her inspection duties.

EHD's inspection contract was canceled by Defendant's Quality Manager, Jack Coltrain, pursuant to Hyundai's instruction to Defendant that EHD's services were no longer needed. (Coltrain Dec. at ¶ 4.) Mr. Coltrain says EHD's employees were released on September 17, 2012. Defendant says Ms. Fuller lost her placement with EHD at that time, and that Ms. Fuller's race, gender, and prior complaints had nothing to do with the decision to terminate EHD's contract.[5] [6]

## F.   Judicial Complaint and Proceedings

Following the loss of her second assignment through Allegiance with EHD, Ms. Fuller filed a charge against Defendant with the EEOC. When Defendant responded to the charge, it represented that Ms. Wilson and Mr. Taunton had warned her about her absenteeism prior to her reassignment and that Ms. Fuller was reassigned because she accumulated three points in violation of the attendance policy. (Doc. # 33-1, at 4.)

After receiving her right-to-sue letter from the EEOC, Ms. Fuller timely filed this case on July 22, 2013. She brings four causes of action for alleged violations of Title VII and 42 U.S.C. § 1981: (1) sexual harassment; (2) racially

---

[5] In Ms. Fuller's brief, she contends that she was released from her assignment with EHD prior to the termination of EHD's contract. But her testimony does not support her argument. Ms. Fuller testified that the reason she left EHD was that "[t]hey ended all of [EHD's] assignment." (Fuller Dep. at 52.) She did testify, however, that she was *demoted* from her lead position prior to the termination of the EHD contract.

[6] Defendant's motion further addresses Ms. Fuller's subsequent employment with C&J Tech, but Ms. Fuller does not assert that Defendant had anything to do with her discharge from that position.

hostile work environment; (3) race discrimination, insofar as she was not offered a permanent position with Defendant and was released from her temporary assignments in Defendant's plant; and (4) retaliation on the same grounds.[7]

On October 28, 2013, Defendant says it learned that Ms. Fuller misrepresented information on her job application about why she left previous jobs (for absenteeism and attendance problems), what period of time she worked for one former employer, and whether she had previously worked for Defendant. She allegedly also failed altogether to disclose employment with one former employer. Defendant, through Ms. Meeks, asserts that, if it had learned of even one misrepresentation, it would not have allowed Allegiance to place her in Defendant's plant as a temp employee.

## IV. DISCUSSION

Defendant argues that it is entitled to summary judgment on all of Ms. Fuller's claims for various reasons, and that after-acquired evidence of her falsified employment application bars recovery on her discrimination and retaliation claims. The discussion will proceed by addressing the requirements for each of Ms. Fuller's four claims before assessing the merits of Defendant's arguments.

---

[7] Section 1981 prohibits unlawful race-based employment discrimination and retaliation and racially hostile work environments. "Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Moore v. Jimmy Dean/Sara Lee Foods, Inc.*, 520 F. Supp. 2d 1359, 1369 (N.D. Ala. 2007). Hence, this court "need not discuss [Ms. Fuller's] Title VII claims separately from h[er] section 1981 . . . claims" because both claims "are based on the same set of facts." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

A.   <u>**Sexual Harassment – Hostile Environment**</u>

Title VII prohibits employment discrimination on the basis of sex.   42 U.S.C. § 2000e-2(a)(1).   It does not mention sexual harassment expressly, but federal courts have applied the statute as reaching "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."   *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (internal quotation marks omitted). Defendant does not contest that Ms. Fuller can show the first three elements of a claim for sexual harassment:   *i.e.*, (1) she belongs to a protected group; (2) she has been subjected to unwelcome sexual harassment such as sexual advances, requests for sexual favors, and other conduct that is sexual in nature; (3) the harassment was based on her sex.   *See id.* at 1245.   Defendant contests the fourth and fifth elements of the claim.

### 1.   *Fourth Element*

"[I]n the cases traditionally described as hostile-environment cases, an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   *Id.* (internal quotation marks omitted).   This requirement "tests the mettle of most sexual harassment claims."   *Gupta v. Fla. Bd. of Regents*, 212 F.3d

571, 583 (11th Cir. 2000) *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).   Whether the plaintiff has endured harassment that is sufficiently severe or pervasive requires her to make a subjective and objective showing.   *Mendoza*, 195 F.3d at 1246.   In Ms. Fuller's case, there is no challenge to her subjective complaint that the harassment was severe. Defendant suggests instead that the alleged mistreatment is not objectively severe. The objective severity of harassment is judged from the perspective of a reasonable person in the victim's position.   *Id.*   The following four factors must be considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."   *Id.*   The four-factor list is not exhaustive.   *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997).   The court should consider these factors in arriving at a view of the "totality of the circumstances," viewing the complained-of conduct in its broader context – not narrowly or incident by incident.   *Mendoza*, 195 F.3d at 1246.

Defendant argues that Ms. Fuller lacks evidence to prove that her job performance was adversely impacted by the alleged sexual harassment.   Defendant asserts that Ms. Fuller's work performance was apparently unaffected because she continued to perform her job well – so well that she assumed a second assignment

doing similar work for EHD in the warehouse area of Defendant's plant.  Thus, Defendant argues that the alleged mistreatment was insufficiently severe or pervasive so as to alter the conditions of her employment and to create an abusive working environment.  (*See* Doc. # 28, at 14, n.14 (citing *Brooks v. Hyundai Motor Mfg. Ala.*, LLC, 444 F. App'x 385, 386 (11th Cir. 2011) (summarily rejecting racially hostile work environment claim where plaintiff testified that racial slurs did not adversely affect her job performance); *Conner-Goodgame v. Wells Fargo Bank, N.A.*, No. 2:12-cv-3426-IPJ, 2013 WL 5428448, at *7 (N.D. Ala. Sept. 26, 2013 (reasoning that the plaintiff's statement "that her performance at [work] never faltered" demonstrated that the alleged harassment "did not unreasonably interfere with [plaintiff]'s work performance"); *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (noting that the plaintiff testified that racially derogatory language upset her but did not affect her work).)

Plaintiff responds that the facts in the cited cases involved isolated incidents of harassment, and thus, the cases are distinguishable.  She argues that the "severe or pervasive element [of her claim] does not require a finding that [her] job performance declined as a result of the harassment."  (Doc. # 32, at 32.)  She is

right.[8]   In *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002), the Circuit, explained:

> [t]he Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable.   Thus, having established the frequency, severity, and humiliating nature of the conduct, [the plaintiff]'s failure to establish convincingly how [the harasser's] conduct interfered with his duties is not fatal to his hostile environment claim, given the totality of the circumstances.

(internal citation omitted).   While there may be no evidence that Ms. Fuller's job performance suffered, a reasonable person in Ms. Fuller's position could find that the other factors comprising the totality of the circumstances (*i.e.*, the frequency, severity, repeated physical touching, and humiliating nature of Mr. O'Neal's alleged misconduct) created a sexually hostile or abusive workplace.   Thus, Ms. Fuller has presented adequate evidence to support the fourth element of a sexual harassment claim.[9]

Defendant also asserts that, because Ms. Fuller cannot account for what Mr. O'Neal said or did on specific dates, her testimony is vague and therefore

---

[8] In the reply brief, Defendant suggests that Ms. Fuller relies on outdated law. Authorities in the field of employment law disagree.   *See* Barbara T. Lindemann, et al., Employment Discrimination Law 20-41 (5th ed. 2012) ("A hostile environment claimant need not necessarily prove that the harassment actually interfered with his or her work performance.").

[9] Defendant emphasizes that, because no one else witnessed Ms. Fuller being subjected to Mr. O'Neal's alleged harassment, it is entitled to summary judgment on her claim.   (Doc. # 28, at 16 n.15.)   Defendant cites no authority to support its position because no such authority exists. As Defendant well knows, Ms. Fuller's testimony is evidence creating a genuine dispute as to whether the harassment occurred as she has described it.

inadequate to support a finding that the harassment was frequent.  (*See* Doc. # 28, at 20 n.24.)  Ms. Fuller acknowledges that she did not journal what happened on specific dates, but testifies that Mr. O'Neal touched her breasts and buttocks "almost every day."  (Fuller Dep. at 78, 81.)  She also testifies that Mr. O'Neal propositioned her and made lewd sexual remarks on a regular basis.  Considering the short duration of her first assignment at Defendant's plant, her testimony is sufficient to support a finding that the harassment was frequent.[10]

Additionally, Ms. Fuller's testimony supports the second and third of the four factors.  Mr. O'Neal's actions far exceeded mere sophomoric forays into the mysteries of romantic liaisons.  His alleged comments were the sort that a reasonable person would find calculated, offensive and humiliating.  Likewise, his alleged misconduct was physical in nature and more than a "mere offensive utterance."  Ms. Fuller claims that Mr. O'Neal violated her person by repeatedly touching her breasts and buttocks.

For these reasons, when the evidence is viewed in the light most favorable to Ms. Fuller, a genuine dispute of material fact exists as to whether Mr. O'Neal's

---

[10] Defendant insinuates throughout its briefing that Ms. Fuller's claims should be disregarded because she worked as a temp employee for approximately three weeks.  (*See, e.g.*, Doc. # 28, at 26 ("[Defendant] respectfully seeks summary judgment and taxed costs against a three[-]week temp's groundless harassment and reassignment claims.").)  Ms. Fuller is entitled to the protection of federal workplace laws and the benefit of this judicial process regardless of the short duration of her tenure.

conduct was sufficiently severe or pervasive to alter the conditions of Ms. Fuller's employment.

2.    *Fifth Element*

An employee who alleges harassment must show that there is a basis for holding the employer liable for the mistreatment.  Where, as here, the plaintiff is harassed by a coworker as opposed to a supervisor, the plaintiff must show that the employer had either constructive or actual notice of the offensive conduct, and that the employer failed to take remedial action when notified.  *Terrell v. Paulding Cnty.*, 539 F. App'x 929, 932 (11th Cir. 2013) (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)).  Thus, Defendant is accountable to a negligence standard.  *Vance v. Ball State Univ.*, ___ U.S. ____, 133 S. Ct. 2434, 2441 (2013) ("[A]n employer is directly liable for an employee's unlawful harassment [of his coworker] if the employer was negligent with respect to the offensive behavior.").

Defendant argues that Ms. Fuller cannot establish this fifth element of her claim because she cannot prove that Defendant's management was actually or constructively aware of the sexual harassment, and she cannot demonstrate that she reported the harassment to her supervisor, Mr. Taunton, or to one of Allegiance's offices, as required by Allegiance's policy for confronting an offender and

reporting offensive conduct.[11]   (*See* Doc. # 29-4, at 53–54 (Allegiance's Notification Policy).)

Ms. Fuller, of course, responds that she informed Mr. Taunton, as well as Ms. Britton and Ms. Wilson, about Mr. O'Neal's offensive conduct.  (Fuller Dep. at 93–98; 103–124.)  Because the evidence suggests that there were two different channels for reporting the alleged harassment (*i.e.*, through Defendant or through Allegiance), the court will consider each channel separately.

### a.   Notice through Mr. Taunton or an Allegiance Office

Defendant asserts that Ms. Fuller should have taken her grievances to Mr. Taunton or an Allegiance office, per the Allegiance policy that Ms. Fuller signed when she began her assignment.  (*See* Doc. # 29-4, at 53–54.)[12]   Ms. Fuller is adamant that she told Mr. Taunton what she had suffered, and a jury could credit her testimony.   But Ms. Fuller does not deny that she never reported the harassment to Allegiance's office while she was assigned to work for Defendant, (*see* Fuller Dep. at 134–35), and Allegiance's policy requires that the victim of

---

[11] Ms. Meeks says that Mr. Taunton denied that Ms. Fuller reported sexual harassment to him, but that is hearsay, (*see* Doc. # 28, at 12 n.5 (citing Meeks Dec at ¶ 12)), and Mr. Taunton's personal testimony on the matter is not in the record.

[12] If Ms. Fuller had not reported her complaints through Allegiance, Ms. Meeks suggests that Ms. Fuller could have alternatively reported harassment directly to her.  (*See* Meeks Dec., Doc. # 29-1, at ¶12.)  This concession suggests that Defendant's reporting channels were open to temporary employees of Defendant.

harassment communicate with both the Allegiance supervisor *and* one of Allegiance's offices.

Even if complaining to Mr. Taunton alone was enough, Ms. Fuller has not offered any evidence that Mr. Taunton, in turn, fulfilled his obligation to report the harassment to Defendant.  As the plaintiff, Ms. Fuller is the party who must prove a basis for Defendant's liability.  Her case is unusual because there are two entities requiring notification of the alleged harassment.  Her temporary placement agency worked in partnership with its client (Defendant) to enforce a policy, and the plaintiff is suing not her temp agency, but Defendant, which consistently refers to her as a temporary employee.  Assuming that Mr. Taunton was informed of the harassment, it should not be Defendant's burden to prove that Mr. Taunton failed to bring the matter to Defendant's attention.  Ms. Fuller must be the party to offer direct or circumstantial evidence that Mr. Taunton in fact advised Ms. Meeks (or some other appropriate member of management) of the alleged misconduct. Perhaps such evidence exists, but Ms. Fuller has not presented it.  Hence, she cannot rely solely upon testimony that she complained to Mr. Taunton.  That evidence is insufficient to show that Defendant knew or should have known about Ms. Fuller's mistreatment through Mr. Taunton and Allegiance.

### b.    Notice through Ms. Britton or Ms. Wilson

Defendant disowns Ms. Britton and Ms. Wilson as proper authorities to receive complaints from temporary employees like Ms. Fuller and maintains that Ms. Fuller should have reported harassment through her employer, Allegiance. (*See* Doc. # 28, at 18–19 n.21; *see also* Doc. # 35, at 31 n.11.)  Defendant cites Eleventh Circuit authority holding that, when employees do not follow established complaint procedures – for example, by complaining to mid-level managers instead of higher authorities identified by a harassment policy – those employees cannot show that there is a basis for holding their employers liable.  *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 753 (11th Cir. 1996) (reasoning that local store manager was not "higher management"); *Terrell v. Paulding Cnty.*, 539 F. App'x 929, 932 (11th Cir. 2013) (finding no legal basis for holding the employer liable where the plaintiff failed to bring the complaint to the individuals identified in the county's harassment policy); *cf. Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1301 (11th Cir. 2000) (holding that the employer-defendant satisfied the second prong of the *Farragher*/*Ellerth* defense when employees did not complain to the proper authority).[13]  Because Ms. Fuller was an Allegiance

---

[13] The *Faragher/Ellerth* affirmative defense requires the employer to show both (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. 775, 807 (1998).  The defense applies in situations where the alleged harasser is a supervisor of the victim.  Because Mr. O'Neal was not a supervisor, Defendant does not seek summary judgment

employee subject to Allegiance's reporting protocol, Defendants posit that any alleged complaints to Ms. Britton and Ms. Wilson are legally irrelevant for purposes of establishing Defendant's awareness, and therefore, liability.  (*See* Doc. # 35, at 31.)

Yet according to Defendant's Associate Handbook, a permanent employee in Ms. Fuller's shoes could have reported harassment to a supervisor like Ms. Wilson.  (Doc. # 29-4, at 64 (paragraphs under heading "Reporting Harassment".) It is undisputed that Ms. Fuller did not get a copy of the Associate Handbook because Defendant does not furnish it to temporary employees.  (Meeks Dep. at 28–29.)  It makes no sense that the notice that Defendant requires and deems adequate from its own employees would not be adequate notice from a temporary employee, especially when the temporary employees interact with and are managed by Defendant's supervisors, just as Ms. Fuller was supervised by Ms. Wilson and Ms. Britton during her tenure as a quality inspector.  Moreover, Ms. Fuller claims that she was told during her orientation that Defendant requires victims of harassment to tell the offender to stop and then to report any continued harassment to a supervisor, (Fuller Dep. at 35), which she says she did.  Ms. Fuller

---

on the basis of this affirmative defense.  To be clear, Defendant asserts that Ms. Fuller cannot complete her prima facie case by giving a legal basis for holding Defendant responsible for the alleged sexual harassment.  (*See* Doc. # 35, at 31 ("Contrary to [Ms. Fuller's] misstatement, she ha[s] this burden . . . .") (citation omitted).)

testifies that Ms. Wilson and Ms. Britton knew about the sexual harassment because she told them about it.

Whether Ms. Fuller actually reported to Defendant's supervisors, and whether such a report was adequate to place Defendant on notice, thereby establishing a basis for Defendant's liability, are "genuine issue[s] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Hence, Defendant's motion for summary judgment on Ms. Fuller's sexual harassment claim is due to be denied.[14]

## B.  **Racially Hostile Work Environment**

A plaintiff establishes a racially hostile work environment under Title VII by showing similar facts to those required to support a sexually hostile work environment. That is, her "workplace [must be] permeated with discriminatory

---

[14] Ms. Fuller also contends that "[t]here is no evidence that [Defendant's] policies adequately train its supervisors, employees, Allegiance on-site supervisors, or temp agency employees of what to do when temp employees are harassed" by Defendant's employees, and that Defendant's policy addresses harassment experienced by its permanent Associates but not its temporary employees. (Doc. # 32, at 38 (referencing Defendant's Associate Handbook).) This line of argument would be relevant in response to the first prong of the *Faragher/Ellerth* defense, but as stated previously, that defense is not before the court. The issue is whether Ms. Fuller has shown that Defendant actually knew or should have known of Mr. O'Neal's alleged harassment.

Alternatively, Ms. Fuller suggests that Defendant can be held liable if it had constructive knowledge of the harassment. (Doc. # 32, at 36.) In view of the undisputed fact that Ms. Fuller is the lone witness (other than Mr. O'Neal himself) with knowledge of Mr. O'Neal's conduct, and there being no other evidence to impute constructive knowledge of O'Neal's conduct to higher management, *see generally Miller*, 277 F.3d at 1278–79, the court cannot conclude from the record that Defendant should have known about the harassment without receiving notice from Ms. Fuller. Additionally, the case authorities cited by Ms. Fuller are likely inapposite because they address the constructive knowledge of an employer where the harasser is the plaintiff's supervisor.

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Miller*, 277 F.3d at 1275 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). She establishes a prima facie case if she can show: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome racial harassment; (3) that the harassment was based on h[er] race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." *Baker v. Ala. Dep't of Pub. Safety*, 296 F. Supp. 2d 1299, 1309 (M.D. Ala. 2003) (Albritton, J.).

Defendant argues that the racially offensive remarks directed at Ms. Fuller by her coworkers are not serious enough, as a matter of law, to have created a racially hostile work environment. The same four factors discussed *supra – i.e.*, whether the conduct was frequent, severe, physically threatening or humiliating, and substantial enough to affect the plaintiff's job performance – are relevant to a determination of whether racial harassment is so objectively severe or pervasive that it altered the terms and conditions of employment. *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009). Defendant says that "[f]ar more egregious facts" have failed to meet this standard at summary judgment. (Doc. # 28, at 17–18 (citing *Brooks*, 444 F. App'x at 386; *Washington v. Kroger Co.*, 218 F. App'x 822,

823 (11th Cir. 2007); *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 56 (11th Cir. 2005).)

In *Brooks*, a black plaintiff alleged that on more than one occasion, her team leader said "you black folks" in an exasperated tone or used the word "nigger." 444 F. App'x at 386.  The Eleventh Circuit affirmed the dismissal of her racially hostile work environment claim because the alleged racial slurs were infrequent and because the plaintiff testified that her work performance was unaffected.  *Id.* In *Washington*, a black plaintiff complained that a coworker called him "boy" on multiple occasions over the course of a few months.  218 F. App'x at 823.  The Circuit reasoned that "[t]hese comments, though demeaning, were not severe or extreme" in nature.  *Id.* at 825.

And in *Barrow*, one plaintiff testified that he observed racially offensive symbols – specifically, Confederate flags, the letters "KKK", and a noose – in various places in his workplace.  144 F. App'x at 57.  He further averred that a supervisor called him "nigger" on three occasions, "boy" on several other occasions, and told him more than once that he would kick his "black ass."  *Id.* Other supervisors made similar racially derogatory or offensive remarks as well. *Id.*  The Eleventh Circuit acknowledged that the alleged symbols and slurs were "discriminatory and offensive," but insufficient to "permeate" the workplace "with discriminatory intimidation, ridicule, and insult" and thereby "create an abusive

working environment." *Id.* at 57–58. (quoting *Harris*, 510 U.S. at 21) (internal quotation marks omitted).   Rather, the Circuit characterized the evidence as "isolated" and "sporadic" in view of the plaintiff's lengthy tenure working for the defendant. *Id.* at 58.

Ms. Fuller asserts that her sexual harassment claim is "inextricably intertwined" with her racially hostile work environment claim, (Doc. # 32, at 22), which suggests her intention that the court analyze the objective severity of the two claims simultaneously.[15]   Plaintiff appears to assert that her race- and sex-based harassment claims are indistinguishable from one another, presumably because Mr. O'Neal, a black man, repeatedly described his proclivity for white women as sexual partners and tried to encourage Ms. Fuller, in his alleged words, "a fine ass white girl," to have sex with him, in his alleged words, a "real nigger." (Fuller Dep. at 72, 93.)   The court has already stated that Mr. O'Neal's alleged sexual harassment was pervasive or severe enough to survive summary judgment, assuming Ms. Fuller can demonstrate a basis for holding Defendant liable.   *See supra* Part IV.A.1.   However, the objective severity of the sexual harassment in this case is not dependent upon Mr. O'Neal's references to his being a black man and Ms. Fuller's being a white woman.   Stated differently, Mr. O'Neal's comments

---

[15] Title VII case law using the term "inextricably intertwined" usually confronts situations where discrimination and retaliation claims were so related that a reasonable EEOC investigation would reveal facts supporting a claim for retaliation in addition to a stated claim for discrimination. *See Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004).

would have been offensive regardless of any reference to race because of the overt, sexually provocative nature of the misconduct.  Moreover, considering the sex- and race-based harassment claims together is inappropriate because the race-based harassment was perpetrated by multiple actors – not solely Mr. O'Neal.

Therefore, in the absence of evidence that the alleged sexual harassment is truly intertwined with the alleged racial harassment, and in the absence of some legal argument for considering the race- and sex-based harassment claims together, the court is addressing separately the alleged race-based, offensive remarks made by all of Ms. Fuller's former coworkers including Mr. O'Neal, as well as Ms. Wilson and Ms. Britton's alleged indifference to those race-based remarks.

Upon review of Ms. Fuller's deposition testimony, the offensive race-based mistreatment is limited to name-calling and inappropriate comments that Ms. Fuller's coworkers, including Mr. O'Neal, made when confronting her about her job performance and her "lies."  During the big verbal confrontation with her line, Ms. Fuller was called "stupid ass white girl" and "stupid white bitch" by Mr. O'Neal and a black female coworker.  A third black female coworker announced her disdain for white people in general, including Ms. Fuller.  Then, Ms. Wilson is alleged to have condoned the inappropriate conduct by not correcting her subordinates.  Other than this episode, the only explicitly race-based animosity

alleged by Ms. Fuller is Mr. O'Neal's calling her a "white bitch" an unspecified number of times as they worked beside one another.

Applying the factors used to measure objective severity or pervasiveness, the alleged race-based harassment could be described as infrequent, but only when compared to more typical cases where the plaintiff endures a single, racially charged incident while working for his employer for months or years. Here, Ms. Fuller was immersed in a racially tense and degrading confrontation within days of starting her job assignment, which lasted only three weeks. Additionally, Mr. O'Neal called her a "white bitch" several times before the incident with the line. Next, although Ms. Fuller's aggressors did not physically threaten her with their words, their verbal mistreatment was humiliating. Lastly, while Defendant dwells on the fact that Ms. Fuller has not claimed that her job performance suffered, a juror could find that a reasonable person's job performance would have suffered under the same circumstances.

Upon consideration of the evidence and of other recent, published Eleventh Circuit decisions not cited by Defendants, the court concludes that the best course is to permit a jury to decide whether the harassment was so objectively severe that it altered the conditions of Ms. Fuller's employment and created an abusive work environment. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1302–03 (11th Cir. 2012) (vacating district court's order granting summary judgment and

remanding for jury trial where a jury could justifiably view the evidence as being objectively severe); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251 (11th Cir. 2014) (discussing *Jones* and reaching the same outcome).[16]

## C.  <u>Race-Based Discrimination and Retaliation</u>

Title VII and Section 1981 prohibit both race-based discrimination and retaliation in the workplace.  In her complaint, Ms. Fuller claims that she was discriminated against on account of her race, and retaliated against for complaining of sexual and racial harassment.  In the complaint, she alleges that Defendant's unlawful discriminatory and retaliatory intent is revealed in Defendant's (1) refusal to consider her for permanent employment and (2) termination or reassignment of her employment, first as a quality inspector, and later as an employee for EHD.

Where, as here, there is no direct evidence of unlawful race-based discrimination or retaliation, the plaintiff typically must use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to show indirect evidence of discrimination or retaliation.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010).  First, she must establish a prima facie case of discrimination and retaliation.  "[S]ummary judgment . . . is

---

[16] Defendant repeats its argument that Ms. Fuller failed to report properly the alleged race-based harassment.  However, the court has previously concluded that Ms. Fuller's testimony that she told Ms. Britton and Ms. Wilson about harassment creates a genuine dispute as to whether Defendant knew or should have known about the harassment.  Additionally, with respect to the racially hostile work environment claim, supervisors are alleged to have witnessed and implicitly condoned several black employees' racial hostility toward Ms. Fuller.

appropriate if [the plaintiff] fails to satisfy any one of the elements of a prima facie case." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).

If she makes her prima facie case of discrimination or retaliation, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions." *Gate Gourmet*, 683 F.3d at 1255. And if the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id.* The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007). If pretext is shown, then a claim of discrimination or retaliation survives summary judgment.

### 1. *Racial Discrimination*

Under the *McDonnell Douglas* framework, the plaintiff makes a prima facie case of discrimination by demonstrating that: "(1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) employment . . . policies were differently applied to her" than to similarly situated employees outside of her protected class. *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). Defendant asserts that Ms. Fuller cannot demonstrate that it treated a similarly situated temporary

employee of another race more favorably than it treated her with respect to her first reassignment for attendance policy issues. Defendant points out that it terminated the employment of similarly situated temp employees of all races who violated the attendance policy during their first month of employment. (*See* Doc. # 29-1, at 16.) With respect to Ms. Fuller's second assignment through EHD, Defendant notes that all EHD employees, regardless of their race, lost their assignments when the EHD contract was terminated.

In her opposition brief, Ms. Fuller does not rebut Defendant's argument directly. She suggests that Ms. Wilson decided to end her first assignment and that Ms. Wilson was motivated by racial animus, as demonstrated by her indifference to alleged racial harassment by her subordinates. However Ms. Fuller may not avoid the first step of *McDonnell Douglas*.[17] A prima facie case ordinarily requires

---

[17] Ms. Fuller claims that she has other evidence that is adequate to support a "convincing mosaic" supporting an inference of intentional discrimination. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision[-]maker.") (internal citations and quotation marks omitted).

Ms. Fuller's mosaic is not "convincing." It might be if there were evidence that Ms. Fuller had a reason to anticipate an offer of full-time employment with Defendant, or if there was evidence to substantiate her claim that Ms. Wilson influenced Ms. Weeks – the actual decision-maker, *see infra* Part IV.C.2.d. – to terminate Ms. Fuller's assignment on August 15, 2012. But there is no such evidence.

a showing that a comparator was treated more favorably, and there are no comparators here. There is therefore no direct or circumstantial evidence in the record to support the inference that Defendant either refused long-term employment to or had Ms. Fuller reassigned on the basis of her race. Accordingly, Defendant's motion for summary judgment is due to be granted as to Ms. Fuller's claims of race-based discrimination.[18]

### 2. *Retaliation*

#### a. **Standard for Making a Prima Facie Case**

To succeed on her retaliation claim, Ms. Fuller likewise must demonstrate a prima facie case of unlawful retaliation. A plaintiff makes a prima facie case of retaliation by showing that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970. Although Title VII discrimination claims can be supported by evidence that an employer has both lawful and discriminatory motives, the Supreme Court has fairly recently announced that "Title VII retaliation claims require proof that the employer's desire to retaliate was the but-

---

[18] In the absence of a prima facie case of discrimination, it is unnecessary to proceed with an analysis of Defendant's proffered non-discriminatory explanations for ending Ms. Fuller's assignments.

for cause" of the plaintiff's challenged employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).[19]

To establish a causal connection, the plaintiff must demonstrate that "the decision[-]maker was aware of [her] protected conduct at the time of the adverse employment action."  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 (11th Cir. 2002) (requiring the same).  Ordinarily, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  *Brungart*, 231 F.3d at 799.  However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision[-]maker did not have knowledge that the employee engaged in protected conduct."  *Id.*

---

[19] Defendant proposes that *Nassar* did away with prior Eleventh Circuit precedent elucidating the causation requirement of a prima facie case of retaliation.  (*See* Doc. # 35, at 34.) A panel of the Eleventh Circuit has noted in an unpublished per curiam opinion that "the [*Nassar*] Court did not clarify the role of 'but for' causation in a plaintiff's prima facie case." *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 833 (11th Cir. 2013).  And in another recent unpublished opinion, another panel explained that *Nassar* requires the plaintiff to bear the "burden of persuasion to proffer evidence sufficient to permit a reasonable fact finder to conclude that discriminatory animus was the 'but-for' cause of the adverse employment action." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 778 (11th Cir. 2014) (internal quotation marks omitted).  No Eleventh Circuit opinion since *Nassar* has disturbed any precedent cited by Ms. Fuller, and the court does not believe that *Nassar* precludes plaintiffs from continuing to present indirect or circumstantial evidence to support a prima face case of retaliation.  *See Terry v. Laurel Oaks Behavioral Health Ctr., Inc.*, ___ F. Supp. 2d ____, No. 1:12-CV-905-WKW, 2014 WL 805477, at *20 (M.D. Ala. Feb. 28, 2014).

### b.   Defendant's Arguments

Defendant first argues that Ms. Fuller did not engage in protected conduct because her complaints were not subjectively or objectively reasonable. It emphasizes anew Ms. Fuller's admission that the alleged harassment of which she complained failed to impact her job performance.  The court has already rejected a similar argument with respect to the objective severity of her mistreatment. Assuming that Ms. Fuller's testimony about her experiences at Defendant's plant is true, any complaint of sexual or racial harassment by coworkers was reasonable and made in good faith.  *See Swanson v. Civil Air Patrol*, 37 F. Supp. 2d 1312, 1325 (M.D. Ala. 1998) ("[A] plaintiff engages in 'statutorily protected activity' when [s]he protests an employer's conduct which is actually lawful, so long as [s]he demonstrates 'a good faith, [objectively] reasonable belief that the employer was engaged in unlawful employment practices.'") (citing *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

Defendant further contends that Ms. Fuller's complaints to Ms. Wilson and Ms. Britton, who Defendant reiterates were not the proper recipients for her grievances, are not the "but-for" cause of Defendant's decisions not to offer a permanent job and to end her assignments.  Instead, Defendant avers that Ms. Fuller was reassigned because Ms. Meeks, who lacked knowledge of Ms. Fuller's complaints to anyone, determined that Ms. Fuller had earned two-and-a-half points

of three allowable attendance points within her short tenure as a temp employee. Defendant further represents that Mr. Coltrain, who also lacked knowledge of Ms. Fuller's complaints, was solely responsible for the decision to end EHD's quality inspection contract, which resulted in her second termination. Assuming *arguendo* that Ms. Fuller makes a prima facie showing of retaliation, Defendant repeats its proffered legitimate, non-retaliatory reasons for reassigning Ms. Fuller – that she was in violation of the attendance policy during her first assignment, and that EHD's contract ended for unrelated reasons during her second assignment.

### c.    Ms. Fuller's Response

In response, Ms. Fuller disputes Defendant's explanation that Ms. Meeks and Mr. Coltrain were the decision-makers or that the proffered, non-retaliatory explanations are truthful. She reiterates that she lodged several complaints with Ms. Britton, Ms. Wilson, and Mr. Taunton, and she stresses that Ms. Britton and Ms. Wilson said that they were tired of her complaining and suggested that she could lose her job because of the disruptions she had caused on the assembly line. Ms. Fuller emphasizes that she suffered two adverse employment actions within close temporal proximity to the times that she complained.

Thus, Ms. Fuller argues, the evidence supports the inference that Ms. Wilson rather than Ms. Meeks decided to terminate the first assignment in retaliation for Ms. Fuller's complaints. In addition to Ms. Wilson's deposition testimony that she

was the one who decided to terminate Ms. Fuller's assignment, Ms. Fuller cites Defendant's EEOC Position Statement in which it represented that Mr. Taunton and Ms. Wilson had conferred with her about her absenteeism. (*See* Doc. # 33-1, at 4.) She notes that the Position Statement lacks any reference to Ms. Meeks as a decision-maker. Further, Ms. Fuller offers as evidence an email from Mr. Taunton to Ms. Meeks stating that Ms. Britton and Ms. Wilson asked him to end Ms. Fuller's assignment because they felt that Ms. Fuller had too many personal conflicts with coworkers. (Doc. # 33-2.) Next, she notes that Ms. Meeks cannot remember who informed her on August 13, 2012, that Ms. Fuller was excessively absent, and Ms. Meeks's deposition admission that it could have been Ms. Wilson. (Meeks Dep. at 103.)

Finally, Ms. Fuller says that the credibility of Defendant's proffered non-retaliatory reason is undermined because Ms. Meeks violated the terms of Defendant's attendance policy by preemptively terminating Ms. Fuller at two-and-a-half points rather than three points. She adds that Defendant falsely reported to the EEOC that Ms. Fuller had actually reached three points at the time that her first assignment was terminated.

With respect to Defendant's contention that the EHD contract was terminated for reasons unrelated to Ms. Fuller, Ms. Fuller responds that she was asked to step down from her lead position with EHD because of Ms. Britton and

Ms. Wilson's complaints to her EHD supervisor, Todd. She claims that EHD was fearful of losing its contract with Defendant because of the complaints.

### d.    Analysis

If Ms. Wilson was a decision-maker in this case, Ms. Fuller could make a prima facie case of retaliation on the basis of Ms. Wilson's purported knowledge of her complaints. However, there is undisputed record evidence showing that it was Ms. Meeks who decided to reassign Ms. Fuller, effective Wednesday, August 15, 2012.[20] Ms. Fuller points to no evidence that contradicts Ms. Meeks's testimony that when she made her decision, she lacked knowledge of Ms. Fuller's complaints of harassment. Ms. Fuller's contention that Ms. Wilson decided to terminate Ms. Fuller's assignment on Monday, August 20, 2012, is unfounded in view of (1) the timing of undisputed events and (2) Ms. Wilson's clarification in her declaration that she mistakenly believed Ms. Fuller was absent from work beginning August 15, 2014. The record is clear that Ms. Wilson made her "decision" several days after Ms. Fuller had already been reassigned by Ms. Meeks; hence, Ms. Wilson's "decision" was moot and based upon mistaken information. (*See* Wilson Dep. at 56–57.)

---

[20] There is no dispute that this was the day of Ms. Fuller's termination. Ms. Fuller has testified that Mr. Taunton contacted her before her shift on August 15, 2012, to say that she should not report to work because her assignment had ended, (Fuller Dep. at 45), and she did not return to Defendant's plant until she was placed with EHD.

40

Similarly, there is no evidence to contradict the testimony of the second decision-maker, Mr. Coltrain, that (1) he was unaware of Ms. Fuller's complaints and uninfluenced by Ms. Fuller's former coworkers, and (2) Ms. Fuller's assignment to EHD had nothing to do with Defendant's decision to end EHD's contract.[21]

Furthermore, there is not a "convincing mosaic" of circumstantial evidence to support a finding of causation absent evidence that the relevant decision-makers were aware of any complaints of harassment.

Thus, because Ms. Fuller has no evidence that her complaints of harassment were known to either decision-maker at the times she alleges she was retaliated against, she cannot make a prima facie case of retaliation. *See Brungart*, 231 F.3d at 799. In the absence of a prima facie case, the court will not proceed to consider whether Ms. Fuller can rebut Defendant's non-retaliatory reason as a pretext for retaliation. In sum, Defendant's motion for summary judgment is due to be granted with respect to Ms. Fuller's claim of unlawful retaliation.

---

[21] As for Ms. Fuller's assertion that Ms. Britton and Ms. Wilson caused or influenced her demotion from a lead position while she worked for EHD in Defendant's warehouse, Ms. Fuller's own evidence suggests that the decision to demote her was made by a supervisor with EHD – Todd – not by anyone who worked for Defendant, and for reasons other than her disagreements with Ms. Britton and Ms. Wilson. (*See* Doc. #33-2.) Additionally, her demotion is not included as a ground for her retaliation claim in her complaint. (*See* Doc. # 1.)

### e.    After-Acquired Evidence

Defendant contends that Ms. Fuller's prospect of recovering reinstatement, compensatory damages, or back pay is eliminated by the existence of after-acquired evidence that Ms. Fuller falsified her job application and additional evidence that Ms. Fuller mitigated her damages by taking and leaving other jobs after losing her first assignment with Defendant.  (*See* Doc. # 35, at 36–37.)  In view of the finding that Defendant is entitled to summary judgment on Ms. Fuller's discrimination and retaliation claims, the after-acquired evidence issue appears to be moot, and the court declines to address the parties' positions on its impact.

## V.  CONCLUSION

In accordance with the foregoing analysis, it is ORDERED that Defendant's motion for summary judgment (Doc. # 27) is GRANTED IN PART and DENIED in PART as set out in this opinion.  Ms. Fuller's racial discrimination and retaliation claims are DISMISSED, but her sexual harassment and racially hostile work environment claims will proceed to trial.

DONE this 26th day of September, 2014.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE